Michael P. Lehmann (Cal. Bar No. 77152)
Bonny E. Sweeney (Cal. Bar No. 176174)
Christopher L. Lebsock (Cal. Bar No. 184546)
Samantha Stein (Cal. Bar. No. 302034)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
E-mail:  mlehmann@hausfeld.com
E-mail:  bsweeney@hausfeld.com
E-mail:  clebsock@hausfeld.com
E-mail:  sstein@hausfeld.com

Joshua H. Grabar (*Pro Hac Vice Forthcoming*)
Grabar Law Office
1735 Market Street, Suite 3750
Philadelphia, PA 19103
Tel: (267) 507-6085
E-mail: jgrabar@grabarlaw.com

*Attorneys for Powerweb, Inc. and Powerweb Energy, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| POWERWEB, INC. AND POWERWEB ENERGY, INC., on behalf of themselves and others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| MURATA MANUFACTURING CO., LTD.; MURATA ELECTRONICS NORTH AMERICA, INC.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; PANASONIC ELECTRONIC DEVICES CO. LTD; PANASONIC ELECTRONIC DEVICES CORPORATION OF AMERICA; SUMIDA CORPORATION; SUMIDA ELECTRIC CO., LTD.; SUMIDA AMERICA COMPONENTS, INC.; TAIYO YUDEN CO., LTD.; TAIYO YUDEN (U.S.A.) INC.; TDK CORPORATION; TDK-EPC CORPORATION; TDK CORPORATION OF | |

1  AMERICA, and TDK U.S.A.
   CORPORATION,

2            Defendants.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Powerweb, Inc. and Powerweb Energy, Inc. ("Plaintiffs") bring this action on behalf of themselves and on behalf of a class of all persons and entities in the United States, its territories, and the Distrrict of Columbia similarly situated (the "Class") for damages and injunctive relief under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) against defendants Murata Manufacturing Co., Ltd.; Murata Electronics North America, Inc.; Panasonic Corporation; Panasonic Corporation of North America; Panasonic Electronic Devices Co. Ltd; Panasonic Electronic Devices Corporation of America; Sumida Corporation; Sumida Electric Co., Ltd.; Sumida America Components, Inc.; Taiyo Yuden Co., Ltd.; Taiyo Yuden (U.S.A.) Inc.; TDK Corporation; TDK-EPC Corporation; TDK Corporation of North America; and TDK U.S.A. Corporation (collectively "Defendants"). Plaintiffs allege as follows, based on information and belief.

## I.   NATURE OF THE ACTION

1.      This action is based on a scheme by Defendants to fix prices of Inductors (as defined herein) (1) that were sold to or billed to persons or entities in the United States during the period from at least January 1, 2003 through December 31, 2016 (the "Class Period"), or (2) where, during the Class Period, the conduct alleged herein had a direct, substantial, or reasonably foreseeable effect on United States commerce.

2.      Inductors are electronic components that store energy in the form of a magnetic field. Along with resistors (a component having a specific amount of resistance to the flow of an electrical current) and capacitors (a two-teminal electronic component that stores potential energy in the form of an electrical field), Inductors are viewed as part of the category of "passive electronic components." As explained in more detail below, Inductors are now found in a wide variety of electronic equipment, including: (a) smartphones and other types of consumer electronic equipment; (b) advanced driver assistance systems ("ADAS") used in vehicles; (c) induction motors that are used in industry to convert electrical energy into mechanical energy; and (d) various military, naval, and air force equipment ranging from missile systems to radars and sonars.

1    3.    In 2015, the global market for Inductors was estimated to be worth $3.86 billion.

2    As explained below, the Defendants control over 75% of the global Inductor market.

3    4.    In 2015, the North American market for Inductors was estimated to be worth

4    $965 million.

5    5.    As alleged herein, Defendants formed a cartel to fix and stabilize the prices for

6    Inductors sold or shipped to the United States and world-wide, just as a similar cartel existed

7    with respect to capacitors that has been the subject of extensive criminal guilty pleas secured

8    by the United States Department of Justice ("DOJ").

9    6.    The following chart, taken from Ferderal Reserve Economic Data ("FRED")

10    maintained on a database by the Federal Reserve Bank of St. Louis shows the effects of

11    Defendants' conspiracy:



The chart depicts a Price Index for imported Inductors (as well as related types of electronic

equipment) using the data from the year 2000 as a baseline. As can be seen, import prices for

Inductors started to plummet drastically in January of 1998, after the entry in December of 1997

of 29 nations (including Japan and the United States) into the Information Technology Agreement ("ITA"),  which eliminated tariffs on world trade of various IT products, including Inductors. Import prices of Inductors started to decline precipitously. They reached a nadir by October of  2003, six months after China agreed to enter into the ITA. Thereafter, the import prices of Inductors increased radically, including two major price spikes in July of 2008 and April of 2009, the period of the worldwide recession. Thereafter, import prices of Inductors climbed steadily, reaching a peak in August of 2014. While prices have since declined slightly, they never returned to their pre-2003 levels, spiking again in August of 2017.

7.    Increased costs of raw materials do not explain the increases in the Import Price Index for Inductors. The following chart depicts how the Raw Material Price Index for passive electronic components stabilized for much of the period between November of 2012 and January of 2016 and declined in the latter portion of that period to the point where it was below its levels in 2012:



8.      Increases in demand do not explain the huge increases in the Import Price Index for Inductors. For example, analysts noted that in March of 2009, the global market for passive electronic components generally had declined by 18% compared to the previous year and that by March of 2010, demand for passive electronic components had declined by an additional 13 percent. As noted above, contrary to sliding electronic component demand in these years, the Import Price Index for Inductors spiked. In Japan, exports of passive components fell from 1,130,000 million yen in 2007 to 705,372 million yen in 2009, according to data available from MITI, the Japanese Ministry of International Trade & Industry.

9.      While use of Inductors in smartphones and ADAS increased in the years that followed, the costs of manufacturing these products declined. For example, by 2015, Air Core Inductors (Inductors consisting of a coil wrapped around a ceramic core) occupied approximately 40% of the market and were much easier to manufacture than other types of Inductors. Yet the Import Price Index for Inductors in 2014-15 was at levels that vastly exceeded those of 2009-10.

10.     The only plausible explanation for the discrepancy between ever higher Inductor prices during times of decreasing global demand and decreasing manufacturing costs is conspiratorial activity.

11.     In the capacitor market, the DOJ obtained a series of guilty pleas with respect to a conspiracy that extended from as long as September of 1997 through January of 2014. *See* https://www.justice.gov/opa/pr/seventh-company-agrees-plead-guilty-fixing-prices-electrolytic-capacitors. The conduct in question included, *inter alia*: (a) face-to-face meetings at which agreements to fix the prices of capacitors were reached; (b) collusive bidding to customers who asked for pricing on capacitors; (c) exchanges and monitoring of price, sales, bid, supply, demand, shipping and production of capacitors; and (d) acts of fraudulent concealment of the conspiracy. The Honorable District Judge James Donato has rejected some of the fines with respect to corporate plea-takers as being too low.

12.     The DOJ's actions with respect to capacitors and its investigation into antitrust violations with respect to resistors (later dropped) have led to the filing of two follow-on class

action proceedings centralized before Judge Donato: *In re Capacitors Antitrust Litig.*, No. 14-3264 JD (N.D. Cal.); *In re Resistors Antitrust Litig.*, No. 15-3820 JD (N.D. Cal.). Defendant Panasonic Corporation is a defendant in both cases.

13.    It has been publicly reported that Panasonic Corporation approached the DOJ and sought leniency with respect to the conspiracy regarding capacitors. Both  NEC Tokin and Taiyo Yuden Co., Ltd. also acknowledged publicly that they were cooperating with investigators with respect to the capacitors conspiracy.

14.    As  was the case in capacitors and resistors conspiracies, the conspiracy regarding Inductors was carried out, in part, under the auspices of the Japan Electronics and Information Technology Industries Association ("JEITA"), which was formed in 2000. Each of the Defendants is a member of JEITA. Through JEITA meetings, as well as meetings of another trade association described below, Defendants exchanged competitively sensitive information and reached agreements just as some Defendants did in cartels concerning capacitors and resistors.

15.    On January 4, 2018, the publication *mLex* first reported that certain Japanese companies received investigative subpoenas from the DOJ's office in the Northern District of California relating to an investigation of price-fixing activity in the Inductors market. Globally, the Inductors market was several billion dollars or more in each year of the Class Period. In the United States, hundreds of millions of dollars of Inductors were sold during the Class Period.

## II.    JURISDICTION AND VENUE

16.    Jurisdiction exists under Section 16 of the Clayton Act (15 U.S.C. § 26) to recover equitable relief for violation of Section 1 of the Sherman Act (15 U.S.C. § 1). The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. § 1331 and Section 16 of the Clayton Act.

17.    Venue is proper in this District under Sections 4(a) and 12 of the Clayton Act (15 U.S.C. §§ 12 and 22), and 28 U.S.C. § 1391(b), (c), and (d) because Defendants regularly transact business in this District. Additionally, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. Specifically, some Defendants maintain offices in

1    this District, and all Defendants sell or seek to sell Inductors to electronics companies located

2    in this District.

3        18.    This Court has jurisdiction over Defendants because the wrongdoing alleged

4    herein was directed at purchasers of Inductors in the United States and in this District.

5                    **III.    PARTIES**

6    **A.  Plaintiffs**

7        19.    Plaintiffs Powerweb, Inc. and Powerweb Energy, Inc. are corporations with their

8    principal places of business located at 4801 South Broad Street, Philadelphia Naval Yard,

9    Building 100 Innovation Center, Suite 130, Philadelphia, PA 19112. Powerweb, Inc. offers

10   energy cost control applications for commercial businesses. It develops and markets Power

11   Smart, a suite of energy cost control applications that utilize wireless communication and Web

12   based applications to provide plug-n-play tools that help building owners and operators reduce

13   energy costs. The company's products include Power Smart Metering, a wireless meter that

14   tracks energy usage over the Web and alarms during excess usage; energy pricing software;

15   Power Smart Portal, a Web portal that integrates metering information and the scheduling and

16   control of power from one centralized network; and Power Smart Controls, a plug and play

17   wireless smart control device that enables customers to control lighting and HVAC from the

18   Web.

19       20.    During the Class Period, Powerweb, Inc. and Powerweb Energy, Inc.

20   puruchased Inductors directly from one or more of the Defendants. Powerweb, Inc. and

21   Powerweb Energy, Inc. paid more for Inductors that they would have in the absence of the

22   conspiracy alleged herein.

23   **B.  The Murata Defendants**

24       21.    Murata Manufacturing Co., Ltd. ("Murata Manufacturing") is a Japanese

25   corporation with its principal place of business located at 10-1, Higashikotari 1-chome,

26   Nagaokakyo-shi, Kyoto 617-8555, Japan. Murata Manufacturing—directly and/or through its

27   predecessors and subsidiaries, which it wholly owns and/or controls—manufactures, markets,

28   and/or sells Inductors in the United States during the Class Period. For example, industry data

shows that Murata Manufacturing had $15 million in sales of Inductors in North America in 2007 alone. Murata Manufacturing is one of the largest global manufacturers of passive electronic components. Murata Manufacturing annually has revenues in excess of $5 billion from sales of passive electronic components, including inductors.

22.     In March of 2014, Murata Manufacturing acquired controlling interest in TOKO, Inc. ("TOKO"), a Japanese company that was a leading Inductor manufacturer that sold hundreds of millions of dollars of Inductors in the United States during the Class Period. According to estimates from one industry expert, TOKO had $47 million of sales of Inductors in North America in 2007 alone. By April of 2015, Murata Manufacturing had assumed all aspects of TOKO's business, including its assets, sales, service, and technical support for the portfolio of TOKO products, including Inductors. To the extent Murata Manufacturing assumed, in whole or in part, the assets and liabilities of TOKO, Plaintiffs also intend to hold Murata Manufacturing liable for any violations of Sherman Act § 1 by TOKO that occurred during the Class Period.

23.     Murata Electronics North America, Inc. ("MENA") is a wholly owned subsidiary of Murata Manufacturing (with Murata Manufacturing and TOKO, "Murata" or the "Murata Defendants"), a Texas corporation with its principal place of business located at 2200 Lake Park Drive SE, Smyrna, Georgia 30080-7604. MENA—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors that were purchased throughout the United States, including in this District, during the Class Period.

24.     Murata Manufacturing also operates Murata Americas RF Product Department ("Murata RF") in the United States, with offices in Carrollton, Texas and Duluth Georgia,

25.     Defendants Murata Manufacturing and MENA will be referred to collectively herein as "Murata" or the "Murata Defendants."

26.     It has been reported that Murata sells its passive electronics components to 40% of the global smartphone market, including Apple, Inc.

//

**C.  The Panasonic Defendants**

27.    Panasonic Corporation ("Panasonic Corp.") is a Japanese corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Panasonic Electronic Devices Co. Ltd. ("PED") was a former Japanese subsidiary of Panasonic Corp. that was a leading manufacturer of Inductors. PED has substantial sales of Inductors in the United States during the Class Period. For example, industry data shows that in 2007 PED sold $10 million of Inductors in North America. In August  of 2011, Panasonic Corp. announced it was dissolving and absorbing PED in April of 2012. Panasonic is responsible for the acts of its wholly owned and controlled subsidiary PED, and Plaintiffs will seek to hold Panasonic Corp. liable for any violations of Section 1 of the Sherman Act (15 U.S.C. §1)  by PED that occurred during the Class Period.

28.    Panasonic Corporation of North America ("PCNA"), a wholly owned subsidiary of Panasonic Corp., is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102. During the Class Period, PCNA—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Panasonic Corp.

29.    Defendants Panasonic Corp., PED, and PCNA are hereinafter referred to as "Panasonic" or the "Panasonic Defendants."

**D.  The Sumida Defendants**

30.    Sumida Electric Co. Ltd. ("Sumida Electric") is a Japanese corporation with its principal place of business located at 3-6, 3-Chome, Ningyo-cho, Nihonbashi, Chuo-ku, Tokyo 103-8589, Japan. Sumida Electric—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States during the Class Period. For example, in 2007 Sumida Electric sold $27 million of Inductors in North America according to industry data.

31.    Sumida America Components Inc. ("Sumida America") is a Delaware corporation with its headquarters at 1251 N Plum Grove Road, Suite 150, Schaumburg, Illinois

60173. Sumida America maintains offices in this District, at 1885 Lundy Avenue, Suite 250, San Jose, California 95131. During the Class Period, Sumida America—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Sumida Electric.

32.    Defendants Sumida Electric and Sumida America are hereinafter referred to as "Sumida" or the "Sumida Defendants."

**E.    The Taiyo Yuden Defendants**

33.    Taiyo Yuden Co., Ltd. ("Taiyo Yuden Co.") is a Japanese corporation with its principal place of business located at 6-16-20, Ueno, Taito-ku, Tokyo 110-0005, Japan. Taiyo Yuden Co.—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States during the Class Period. In its 2017 Annual Report, Taiyo Yuden Co. estimated that it sold 41.273 billion yen worth of Inductors.

34.    Defendant Taiyo Yuden (USA) Inc. ("Taiyo Yuden USA"), an Illinois corporation, is a wholly owned subsidiary of Taiyo Yuden Co., with its principal place of business located at 10 North Martingale Road, Suite 575, Schaumburg, Illinois 60173. During the Class Period, Taiyo Yuden USA— either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Taiyo Yuden Co.

35.    Defendants Taiyo Yuden Co. and Taiyo Yuden USA are collectively referred to herein as "Taiyo Yuden" or the "Taiyo Yuden Defendants."

**F.    The TDK Defendants**

36.    TDK Corporation is a Japanese corporation with its principal place of business at 13-1 Nihonbashi 1-chrome, Chuo-ku 103-8272, Tokyo, Japan. TDK Corporation—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States during the Class Period.

37.    TDK-EPC Corporation ("TDK-EPC") is a Japanese corporation with its principal place of business located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo 108-0023, Japan. TDK-EPC was founded on October 1, 2009 from the combination of the passive components businesses of TDK Corporation and non-party EPCOS AG, a German corporation. TDK-EPC—directly and/or through its predecessors and subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Inductors in the United States during the Class Period.

38.    Defendant TDK U.S.A. Corporation ("TDK USA"), a New York corporation, is a wholly owned subsidiary of TDK Corporation with its principal place of business located at 525 RXR Plaza, Uniondale, New York 11556. During the Class Period, TDK USA—either directly or through its business units, subsidiaries, agents, or affiliates—sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parents, TDK Corporation and TDK-EPC.

39.    Defendant TDK Corporation of America ("TDK America") is a subsidiary of TDK Corporation with its principal place of business at 475 Half Day Road, Suite 300, Lincolnshire, Illinois 60069. TDK America sold and distributed to United States purchasers Inductors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, TDK Corporation

40.    TDK Corporation, TDK America, TDK-EPC, and TDK USA are collectively referred to as "TDK" or the "TDK Defendants."

41.    The TDK Defendants were the largest manufacturers of Inductors during the Class Period. For example, in 2007 TDK sold $57 million in Inductors in North America, more than any other manufacturer according to one industry expert. Following the 2009 combination, TDK began to sell TDK and EPCOS-branded Inductors, and does so to this day.

**G.  Agents and Co-Conspirators**

42.    Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

## IV.    AFFECTED COMMERCE

43.    During the Class Period, Defendants collectively controlled the vast majority of the market for Inductors, both globally and in the United States, as further described below.

44.    Defendants sold directly Inductors to customers located in the United States. Substantial quantities of Inductors are shipped from outside the United States into the United States in a continuous and uninterrupted flow of interstate and foreign trade and commerce.

45.    In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Inductors, as well as payments for Inductors and related products sold by Defendants, traveled in interstate and foreign trade and commerce. The business activities of Defendants in connection with the production and sale of Inductors that were the subject of the charged conspiracy were within the flow of, and substantially affected, interstate and foreign trade and commerce.

### A.  Defendants' Conduct Involved Import Trade or Import Commerce and Had a Direct, Substantial and Reasonably Foreseeable Effect on U.S. Domestic and Import Trade or Commerce that Gave Rise to Plaintiffs' and Class Members' Antitrust Claims

46.    Defendants' illegal conduct involved United States import trade or import commerce. Defendants knowingly and intentionally sent price-fixed Inductors into a stream of commerce that they knew led directly into the United States, one of their most important markets and a major source of their revenues. In this respect, they directed their anticompetitive conduct at imports into the United States with the intent of causing price-fixed Inductors to enter the United States market and inflating the prices of Inductors destined for the United States.  Such conduct was meant to produce and did in fact produce a substantial effect in the United States in the form of higher prices.

47.    The United States Inductors market is enormous. According to a 2017 analyst report, The United States Inductor market represents 71% of the total North American Inductor market. The total size of the United States Inductor market was approximately $768 million in 2015 and is expected to reach $965 million by 2021. Demand from private industry (such as smartphone and automobile makers) and from the military is fueling this growth.

48.     Defendants recognize the importance of sales of Inductors in the United States in their annual reports and other financial reports. That is why they created and invested in entities like MENA, Murata RF, Taiyo Yuden USA, Sumida America, PCNA, TDK America, and TDK USA. The websites of those entities boast about their respective sales networks in the United States.

49.     To give one example, MENA's website states that "[w]e serve as the regional and functional headquarters supporting our customers' engineering and procurement activities throughout the Americas. Along with experienced teams of Technical Sales Managers located in several major hubs, including Silicon Valley, San Jose, San Diego, Austin, Dallas, Chicago, Detroit, Kokomo and Boston, we utilize a network of Sales Representatives and Authorized Distributors to service our customers' requirements for sales and technical support, design expertise, logistics and supply chain initiatives." https://www.murata.com/en-us/about/company/muratalocations/americas/mea.

50.     Taiyo Yuden's website similarly lists a headquarters for Taiyo Yuden USA in Chiocago and "sales offices" in San Diego, San Jose, Chicago and Boston. https://www.yuden.co.jp/ut/company/overseas/.

51.     As a third example, TDK America's website states that "TDK Corporation of America (TCA), a group company of TDK Corporation, was established in 1974 in California as the sales and marketing force for electronic components in North America and Latin America. TCA has grown into a sales force of fifteen offices in the U.S. and a headquarter office located in Lincolnshire, Illinois. The combined efforts of sales, marketing and technical personnel have built the TDK name as a respected leader in the industry." http://www.component.tdk.com/about-us.php.

52.     Sumida and Panasonic likewise tout their worldwide sales networks, which include the United States.

53.     Defendants and others shipped millions of Inductors into the United States during the Class Period. In addition, Inductors that were shipped to countries such as Mexico, Taiwan, China, and Canada were billed to United States companies.  As a result, a substantial

1    portion of Defendants' revenues were derived from the United States market.  Defendants spent

2    millions of dollars on advertising their products in the United States.

3        54.    Because of the importance of the United States market to Defendants and their

4    co-conspirators, Inductors intended for importation into and ultimate consumption in the United

5    States were a focus of Defendants' illegal conduct. Defendants knowingly and intentionally

6    sent price-fixed Inductors into a stream of commerce that led directly into the United States.

7    This conduct by Defendants was meant to produce and did in fact produce a substantial effect

8    in the United States in the form of artificially-inflated prices for Inductors.

9        55.    Thus, when high-level executives within Defendants' companies agreed on

10   prices for Inductors, they knew that their price-fixed Inductors would be sold in the United

11   States.

12       56.    For the reasons set forth above, Defendants' illegal conduct involved import

13   trade or import commerce into the United States.

14       57.    Defendants' illegal conduct had a direct, substantial, and reasonably foreseeable

15   effect on United States domestic and import trade or commerce in the form of higher prices for

16   Inductors that Plaintiffs and Members of the Class paid. These prices, tainted by collusion,

17   directly and immediately impacted Plaintiffs and Members of the Class in the United States. In

18   this respect, the United States effects of Defendants' illegal conduct gave rise to Plaintiffs' and

19   Class Members' antitrust claims and were the proximate cause of the injury that Plaintiffs and

20   Members of the Class suffered.

21       58.    A number of facts demonstrate that Defendants' price-fixing conspiracy had a

22   direct, substantial and reasonably foreseeable effect on domestic commerce.

23           **B.  The Defendants Targeted the United States.**

24       59.    Because of the relatively small size of Inductors, transportation costs are

25   relatively minor and there is substantial international trade in these electronic components.

26       60.    During the Class Period, Defendants manufactured and sold substantial

27   quantities of Inductors shipped from outside the United States in a continuous and uninterrupted

28   flow of interstate and foreign trade and commerce.  Defendants also sold substantial amounts

of Inductors to foreign companies, which in turn had contracts with companies based in the United States to assemble equipment for such companies to sell in the United States. Apple Inc.'s contracts with Foxconn Technology, Compal Electronics, Pegatron Corporation and Wistron Corporation (based in China or Taiwan) to assemble smartphones are examples of this. In addition, substantial quantities of equipment and supplies necessary to the production and distribution of Inductors, as well as payments for Inductors and related products sold by Defendants, traveled in interstate and foreign trade and commerce.  The business activities of Defendants in connection with the production and sale of Inductors were within the flow of, and affected substantially, interstate and foreign trade and commerce.

61.    Defendants engaged in conduct both inside and outside the United States that caused direct, substantial, and reasonably foreseeable and/or intended anticompetitive effects upon interstate commerce within the United States.

62.    Defendants, directly and through their subsidiaries agents, engaged in a conspiracy to fix or inflate prices of Inductors that restrained trade unreasonably and affected adversely the market for Inductors. Defendants affected commerce, including import commerce, substantially throughout the United States, proximately causing injury to Plaintiffs and members of the Class.

## V.    FACTUAL ALLEGATIONS

63.    Plaintiffs incorporate by reference the factual allegations made in previous sections.

### A.  The Structure Of The Inductor Market Is Conducive to Collusion.

64.    Several factors inherent in the Inductor market are conducive to collusion. These include: (1) the commodified nature of Inductors; (2) market concentration, with Defenndants having a collective dominant position; (3) high barriers to entry; and (4) inelasticity of demand.

//

//

//

//

1

### 1.    Inductors Generally And Types Of Inductors.

2    65.    As noted above, Inductors are passive electronic components that store and

3    regulate energy in a circuit using principles of electromagnetism. Examples of various forms of

4    Inductors are depicted in the following photograph:

5
6
7
8    
9
10
11
12

13    66.    As can be seen, Inductors can be as simple as wrapping a metal wire around

14    some form of a core. At present, the principal type of Inductors are air core Inductors, iron core

15    Inductors, ferrite core Inductors, toroidal core Inductors, and multilayer Inductors. Air core

16    Inductors are the simplest type to make, with a wire wrapped around a ceramic core. These are

17    the cheapest form of Inductors to manufacture. Iron core Inductors are wrapped around an iron

18    core and can be smaller in size than air core Inductors. Ferrite Inductors use ferrite, a metal

19    oxide ceramic based around a mixture of ferric oxide, which has a high degree of magnetic

20    permeability. Toroidal core Inductors are made using a coil wrapped around a toroidal

21    (doughnut-shaped) core. The core is often also made of ferrite. Multilayer Inductors consist of

22    two conductive coil patterns that are arranged in two layers in the upper part of a multilayered

23    body and are electrically connected in consecutive manner. Thin film Inductors are a type of

24    multilayer Inductor typically utilizing a ceramic chip that produces a small form factor. The

25    Defendants each produce a variety of the various categories of Inductors.

26
27
28

67.     The global market shares for these various types of Inductors are depicted in the following graphic taken from a 2017 market report:

68.     Inductors have various uses, as noted above. In automobiles, they are used, for example, in headlight circuitry, transmission systems, electronic control units, fuel systems, ar navigation systems and ADAS. In consumer applications, they are used in LCD televisions, LED lighting, computer laptops, digital still cameras, smartphones, printers, game consoles, air conditioning systems and home appliances. In industry and defense, for example, they are used



in security systems, audio line suppression, and power line systems.

69.     The following chart depicts the value, volume and pricing of Inductors by end-use segment:



70.    A 2017 report has indicated that the global market for Inductors was worth $2.78 billion in 2014 and is estimated to reach $3.75 billion in 2019. The North American Inductor market (of which the United States has approximately 71% was worth $768 million in 2015 and is estimated to be worth $965 million in 2021.

### 2.    Product Commoditization.

71.    Inductors are a commoditized product and are indeed found in the United Nations Commodity Statistics database under a separate reference code (no. 77122). A 2017 market report indicates that product differentiation is "minimal."

72.    Inductors are marked using standardized values. The first two digits marking a standardized Inductor are the value of the inductance, expressed in units of Henry, and the third digit is the multiplier by power of 10. So, "101" = 10*101μH = 100μH. If there is an R, it acts as a decimal point and there is no multiplier. Therefore, "4R7" means 4.7μH. Precision of an Inductor is also expressed in standard terms, using a final letter F, G, J, K, or M, which refers to +/-1%, +/-2%, +/-5%, +/-10%, and +/-20%, respectively.

73.    The International Electrotechnical Commission, an organization that promotes standardization in the electrical fields, has published standards for testing relating to Inductors. Defendants' products refer to these standards. For example, TDK's product reference guide states that "[a]ll chokes [another name for Inductors] for low-frequency main networks are dimensioned and tested in compliance with applicable EN and IEC standards." Inductors are mass produced pursuant to these standards, making them interchangeable.

74.    Defendants understand their products are interchangeable. A webpage maintained by TDK relating to Inductors allows users to enter a non-TDK product code so that, "[u]sing the part number of a product of other manufacturers, [TDK's] products with similar specifications          can          be          searched." https://product.tdk.com/en/search/inductor/inductor/smd/cross_reference/.    Other Defendants' websites offer similar comparison aids.

### 3.    Market Concentration.

75.    As noted above, market concentration within the Inductor industry is high. While there are a number of manufacturers, the Defendants collectively control a dominant global market share, as depicted in the following graphic.



76.    Acquisitions within the Inductor market, such as Murata Manufacturing's acquisition of TOKO in April of 2015 and TDK's successful tender offer for EPCOS AG in October of 2008, have added to this market concentration.

4.    **Entry Barriers.**

77.    Entry barriers into the Inductor market are high. Costs of maintaining extensive sales networks, supply chains, production facilities, and a global presence are considerable. Murata, for example, announced in February of 2016 the creation of an expanded 28,000 square foot facility in Carrollton, Texas for the purpose of better integrating its United States operations.

78.    Barriers to entry also exist because of the resources of the incumbents. The Inductors market is a mature one dominated by established corporations, most of which have global operations. Panasonic and TDK both manufacture a variety of electronic products, as well as other electronic components. Panasonic reported revenues of over $62 billion in its 2017 fiscal year. TDK reported revenues of over $10 billion in 2017. Both are large and diverse multinational corporations that, like all Defendants, can benefit from economies of scale. Murata manufactures virtually every electronic component and has yearly revenues that top $5 billion. Taiyo Yuden is a diversified manufacturer of passive electronic components with annual net sales in excess of $2 billion, most of which is attributable to sales of electronic components. Sumida is another international giant, who most recently announced sales in excess of $700 million annually. Sumida has R&D offices in the United States, Asia, Europe, and Canada; sales offices in the United States, Asia and Europe; and factories in Asia, Mexico and Europe.

79.    Meaningful new entry of Inductor manufacturers that could have posed a challenge to the Defendants did not occur during the Class Period. As noted above, some of the Defendants acquired smaller companies.

5.    **Demand Inelasticity.**

80.    A 2017 report on the Inductor market has noted that "demand is considerably inelastic." As the report explains:

> In the inductors market, the consumer base is rather fragmented and product differentiation is minimal, thus lowering the overall bargaining power of customers. But fixed costs for suppliers are high thus giving them some power. For a consumer, the switching cost is high and the possibility of backward

integration is low since production of inductors involves exclusive expertise and most OEMs find it cheaper to buy it from such suppliers than foray into its manufacturing.

The bargaining power of customers is *low*. (Emphasis in original).

81.     This is an accurate assessment for several reasons. First, the prices of most Inductors are low in relation to the electronic equipment they are used in. Second, there are no ready substitutes for Inductors; other passive electronic components, like resistors or capacitors, perform a different function altogether. And, as noted in the quotation above, switching costs can be prohibitive, thus causing OEMs to often stay with the same supplier.

**B.  The Conduct Of Defendants Is Plausibly Explained By Collusion.**

82.     As noted above, beginning in 2003, Inductor prices steadily rose in a historically unprecedented manner, despite the lifting of tariffs by the ITA, despite declining demand for a period of time, despite stable or lower raw material costs, and despite the great international recession of 2008-09 and its aftermath.

83.     The only plausible explanation for this behavior is a conspiratorial one. In such a period, the Defendants would have a motive to conspire to stabilize or increase prices for their products.

84.     Collusion is an explanation consistent with the market factors described above and is also consistent with: (1) the subpoenas just issured by DOJ; (2) the involvement of several of the Defendants in conspiracies in other markets, and (3) the involvement of Defendants in trade associations that facilitated collusion.

**1.     Subpoenas Issued By DOJ.**

85.     On January 4, 2018, the publication *mlex* reported:

Electronics manufacturers have been subpoenaed by US antitrust prosecutors as part of a price-fixing investigation involving the inductor market, Mlex has learned.

Subpoenas were sent out in mid-November, and the San Francisco office at the Department of Justice's antitrust division is overseeing the investigation, it is understood.

The inductor subpoenas are part of a long-running investigation, which also includes capacitors and resistors. The components are part of electrical circuits

that store and regulate the flow of electricity, and are ubiquitous in electronic devices.

86.    Plaintiffs reasonably believe that Panasonic may have given the DOJ information about a conspiracy in the Inductors market, just as it has reportedly done with respect to the capacitors market, where seven companies have pled guilty to antitrust violations. As noted above, Taiyo Yuden and TDK are reportedly cooperating in the investigation of the capacitors industry, which is ongoing.

### 2.    Involvement of Panasonic In Other Conspiracies.

87.    Collusion is also a plausible explanation of what occurred in the Inductors market because Defendant Panasonic is a well-known recidivist antitrust violator. Panasonic, one of the world's leading manufacturers of Inductors, has pled guilty in numerous price-fixing cases, including electronic products.

88.    On September 30, 2010, Panasonic agreed to plead guilty and to pay a large criminal fine for its participation in a conspiracy to price-fix refrigerant compressors from October 14, 2004 through December 31, 2007.

89.    On July 18, 2013, Panasonic agreed to plead guilty and to pay a $45.8 million criminal fine for its participation in a conspiracy to price-fix switches, steering angle sensors and automotive high intensity discharge ballasts installed in cars sold in the United States and elsewhere from at least as early as September of 2003 until at least February of 2010.

90.    On information and belief, that same day, Panasonic's subsidiary, SANYO Electric Co., Ltd., agreed to plead guilty and to pay a large criminal fine for its participation in a conspiracy to fix the prices of cylindrical lithium-ion battery cells sold worldwide for use in notebook computer battery packs from about April 2007 until about September 2008.  The production and sale of Inductors resistors were often overseen by the same departments and personnel that were involved in fixing lithium ion battery prices.

91.    In 2008, Panasonic created "Rules Concerning Activity and Relationship with Competitors" that were supposed to ensure antitrust compliance; a Compliance Committee that meets annually was set up to monitor these efforts. The rules did not solve the problem. In its 2012 corporate "Sustainability Report," Panasonic stated:

> In fiscal 2012, the company reviewed the efforts related to the company's compliance activities in the corporate "Compliance Committee" and discussed additional personnel measures. The top management strongly restated that it is the company's policy not to engage in cartel activities and requests employees mainly in sales and marketing departments to confirm whether they encounter suspicious activities or not.

https://www.panasonic.com/global/corporate/sustainability/pdf/sr2012e.pdf. The same report noted that Panasonic had created a Global & Group Risk Management Committee chaired by the President of the company and including directors and executive officers in charge of corporate operational fuctions at the company's headquarters. That group identified the "corporate major risks" for the then just-ended fiscal year 2012 and the then upcoming fiscal year 2013. On both lists was "Cartels." Subsequent corporate sustainability reports for 2013, 2014 and 2015 identified this same "corporate major risk' for the 2013, 2014 and 2015 fiscal years, as well as the 2016 fiscal year. *See* https://www.panasonic.com/global/corporate/sustainability/pdf/sr2013e.pdf; http://www.panasonic.com/global/corporate/sustainability/downloads/back_number/pdf/2014/sr2014e.pdf.

92.    The foregoing pattern of anticompetitive practices in various technology-related markets is illustrative of Panasonic's corporate conduct, which has included illegal activity aimed at generating profits at the expense of its customers. It is highly plausible that the same type of conduct occurred in the Inductors market.

93.    Faced with an overall decline in demand for their Inductors, and steep price declines after the introduction of the ITA, Panasonic and its colleagues had a keen desire to avoid price competition.

94.    The highly concentrated nature and structure of the Inductors market made it likely that collusion would be both possible and profitable. As shown above, Defendants comprised over 75% of the market during much of the Class Period. They thus engaged in a historically unprecedented set of increases for Inductor prices that lasted at least eleven years.

---

CLASS ACTION COMPLAINT                 22

**3.    Use of Trade Associations To Facilitate The Conspiracy.**

95.    Defendants agreed to operate as a cartel through both oral and written communications among directors, executives, officers, business unit managers, sales representatives, and employees of the Defendant companies.

96.    Trade associations provided opportunities for Defendants to meet frequently and exchange information to facilitate collusion.  Defendants are members of a number of trade associations in the United States, Asia and Europe.  Their overlapping membership in various trade associations also provided incentive for cartel members to stay within the illegally agreed upon price framework, as they could monitor and police one another's activities in the Inductor market and punish non-compliance. Defendants' participation in trade associations, as described above, helped facilitate their collusion.

97.    One such organization is the Electronic Components Industry Association ("ECIA"), which is located in Alpharetta, Georgia.  Several of the Defendants are members of this organization, including MENA, Sumida America, TDK America, and PCNA (through its division Panasonic Industrial Sales Company of America). They regularly meet to discuss matters of mutual concern. As the website of the ECIA states:

> ECIA provides resources and opportunities for members to improve their business performance while enhancing the industry's overall capacity for growth and profitability. From driving critical conversations and process optimization to product authentication and industry advocacy, ECIA is your trusted source for support, insight and action.

> Bringing together the talent and experience of broad array of industry leaders and professionals representing all facets of the electronics components supply chain, ECIA is uniquely positioned to enable individual connection as well as industry-wide collaboration. As the supply chain becomes increasingly more complex, ECIA serves as a vital nexus for refinement and progress.

https://www.ecianow.org/about-ecia/what-we-do/.

98.    For manufacturers, the ECIA promises access to "[d]ata & statistics for better decision-making (Executive summaries, confidence surveys, end market reports, etc.)", the opportunity to "[s]hape opinion and direction by participating on Councils and Committees that design, develop, and publish processes the industry will follow" and "[n]etworking among the

industry    leaders    (…can't    have    enough    professional    relationships!)."
https://www.ecianow.org/join-ecia/manufacturer/.

99.    The data and statistics mentioned by ECIA are significant. For the Inductors market, ECIA prepares quarterly sale reports of Inductors sold in North America, as well as indices of monthly and weekly sales of electronic components. https://www.ecianow.org/north-america-sales-booking-reports/. The ECIA also has a Statistics and Industry Data Council, the role of which is defined as follows:

> The Statistics and Industry Data Council oversees several programs that collect and provide unique industry data. These include commodity and market segment level sales trends as well as discrete passive electronic components market reports. The primary outputs are the Electronic Component Sales Trends survey (ECST) and the MS Series, a collection of 13 individual reports on capacitors, resistors, and inductors that include world statistics.

https://www.ecianow.org/about-ecia/councils/statistics-industry-data-council/.    The    same webpage goes on to list among "2014 accomplishments" that the Statistics and Industry Data Council "[c]ompiled and published more than 100 statistics reports (MS series) on *North American Sales and Booking* for capacitors, resistors and inductors plus monthly reports on world statistics for capacitors and quarterly reports for world statistics for resistors and inductors." Within the council is the "Passive Components Market Services Working Group," of which TDK America, Panasonic Corp., and MENA are members.

100.    By virtue of their membership in such organizations, Defendants have the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.  ECIA, for example, hosts an annual "Executive Conference."  The 2014 conference was held in Chicago, Illinois, and the 2015 conference was held in Chicago on October 25-27, 2015. ECIA also hosts an "EDS Summit" that includes electronic component manufacturers "where valuable idea exchange can happen through high-level strategic meetings, event functions and informal gatherings." https://www.ecianow.org/connection-points/eds/. This year's EDS Summit will take place on May 15-18, 2018 in Las Vegas, Nevada.

In Japan, as noted above, there exists JEITA, to which all the Japanese Defendants belong. JEITA conducts an annual conference described as follows: "[a]ll JEITA member companies gather annually for a conference that serves as the industry's premier decision-making forum." http://www.jeita.or.jp/english/about/orga/index.htm. Its Board of Directors "discusses and makes decisions concerning important issues related to JEITA's activities, including items raised at the Annual Conference." *Id*. JEITA has created five sector-specific boards including an Electronics Component Board. One of the current Vice-Chairmen of the Electronic Components Board is Tsuneo Murata, the President of Murata Manufacturing and Takehiro Kamigama, President and CEO of TDK.  As of July 7, 2017, the Chairman of JEITA is Shusaku Nagae, Chairman of the Board of Panasonic. JEITA maintains an office in Washington, D.C.

101.    JEITA holds periodic meetings lasting up to several days and nights. There are formal meetings at which minutes are taken, but there are also social events, such as meals and parties. In addition, JEITA has subcommittees organized by general product types and purposes, such as the Passive Components Subcommittee. Subcommittees also meet periodically, telephonically and sometimes in person. On information and belief, JEITA also has working groups organized by specific passive component.

102.    Through JEITA meetings, Defendants had the opportunity to exchange competitively sensitive information on price and volume, and for specific bids.

103.    Trade organizations such as JEITA are often pretext for industry members to conspire. It has now been publicly admitted that membership in JEITA played a large role in facilitating collusion by the defendants in those actions.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS PURSUANT TO THE INJURY-DISCOVERY RULE AND THE DOCTRINE OF FRAUDULENT CONCEALMENT

104.    Plaintiffs and members of the Class could not have discovered, with reasonable diligence, the existence of the conspiracy, or the fact that they had been injured as a result of it, until the DOJ's investigation was made public in January of 2018.

105.    Defendants actively concealed the existence of the conspiracy from Plaintiffs and members of the Class, and there is nothing in the public domain that would put Plaintiffs or anyone else on notice that Defendants were conspiring at meetings regarding prices for Inductors sold in the United States.

106.    The meetings held by Defendants were furtive. The nature of a price-fixing cartel requires secrecy.

## VII.    CLASS ACTION ALLEGATIONS

107.    Plaintiffs bring this action on behalf of itself and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on behalf of the members of a Class, which is defined as follows:

> All persons or entities in the United States, its territories, and the District of Columbia who purchased Inductors (including through controlled subsidiaries, agents, affiliates, or joint ventures) directly from any of the Defendants, their subsidiaries, agents, affiliates or joint ventures from January 1, 2003 through December 31, 2016 (the "Class Period"). Excluded from the Class are Defendants and their co-conspirators, subsidiaries, agents, and/or affiliates; Defendants' officers, directors, management, employees, subsidiaries, and/or agents; all governmental entities; and the Judges and chambers staff presiding over this case, as well as any members of their immediate families.

108.    The Class definition encompasses those who purchased Inductors directly from any of the Defendants, even if the Inductors purchased were manufactured, sold, or distributed by a given Defendant's predecessors, parents, business units, subsidiaries, affiliated entities, principals, agents, or co-conspirators.

109.    While Plaintiffs do not know the exact number of the members of the Class, Plaintiffs believes there are at least thousands of members.

110.    Plaintiffs also do not know the exact duration of the alleged conspiracy and reserves the right to amend its complaint.

111.    Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was applicable to all of the

1    members of the Class, thereby making appropriate relief with respect to the Class as a whole.

2    Such questions of law and fact common to the Class include, but are not limited to:

3            a.   Whether Defendants engaged in a combination and conspiracies among

4                 themselves to fix, raise, maintain, and/or stabilize the prices of Inductors

5                 sold to or billed in in the United States;

6            b.   The identity of the participants of the alleged conspiracy;

7            c.   The duration of the alleged conspiracy and the acts carried out by

8                 Defendants in furtherance of the conspiracy;

9            d.   Whether the alleged conspiracy violated the Sherman Act;

10           e.   Whether the conduct of Defendants, as alleged in this Complaint, caused

11                injury to the business or property of Plaintiffs and members of the Class;

12           f.   The effect of the alleged conspiracy on the prices of Inductors sold in the

13                United States during the Class Period;

14           g.   The appropriate injunctive and related equitable relief; and

15           h.   The appropriate class-wide measure of damages.

16    112.   Plaintiffs' claims are typical of the claims of the members of the Class, and

17    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members

18    of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially

19    inflated prices for Inductors purchased indirectly from Defendants.

20    113.   Plaintiffs' claims arise out of the same common course of conduct giving rise to

21    the claims of the other members of the Class. Plaintiffs' interests are coincident with, and not

22    antagonistic to, those of the other members of the Class. Plaintiffs are represented by counsel

23    who are competent and experienced in the prosecution of antitrust, unfair competition, and class

24    action litigation.

25    114.   The questions of law and fact common to the members of the Class predominate

26    over any questions affecting only individual members, including legal and factual issues

27    relating to liability and damages.

28

115.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

116.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**VIII.     CLAIM FOR RELIEF**
**VIOLATIONS OF THE SHERMAN ACT**
**15 U.S.C. §§ 1 and 3**
**(Alleged against all Defendants)**

117.     Plaintiffs hereby repeat and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

118.     Defendants violated Sections 1 and 3 of the Sherman Act by conspiring to artificially restrict competition in the market for Inductors.  Starting January 1, 2003 Defendants met repeatedly to exchange competitively sensitive information, including price and price-related information. The effect of these meetings was to raise, fix, set, stabilize, or otherwise artificially manipulate the prices of Inductors beyond the natural interplay of supply and demand.

119.     Defendants formed a cartel, organized around JEITA meetings, designed to raise, fix, set, stabilize, or otherwise artificially manipulate the prices of Inductors beyond the natural interplay of supply and demand.

120.     As a result of Defendants' and their co-conspirators' unlawful conduct and acts taken in furtherance of their conspiracy, prices for Inductors sold to purchasers in the United

States during the Class Period were raised, fixed, maintained, or stabilized at artificially inflated cartel levels.

121.    The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

122.    For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including setting prices of Inductors at supra-competitive prices, and selling these Inductors to Plaintiffs and the members of the Class.

123.    Defendants' anticompetitive and unlawful conduct is illegal *per se*.

124.    As a result of Defendants' anticompetitive and unlawful conduct, Plaintiffs and the members of the Class have been injured in their businesses and property in that they have paid more for the Inductors that they purchased during the Class Period than they otherwise would have paid but for Defendants' conduct.

## IX.    DEMAND FOR JUDGMENT

125.    Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class that:

A. This action may proceed as a class action, with Plaintiffs serving as Class Representatives under Fed. R. Civ. P. 23(c);

B. Defendants have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3) and that Plaintiffs and the Class have been injured in their business and property as a result of Defendants' violations;

C. Plaintiffs and the Class are entitled to recover damages sustained by them, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15;

D. Plaintiffs and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, and that such interest be awarded at the highest legal

1    rate from and after the date this class action complaint is first served on

2    Defendants;

3    E. Plaintiffs and the Class are entitled to equitable relief appropriate to remedy

4    Defendants' restraint of trade, including issuing a permanent injunction against

5    Defendants and their parents, subsidiaries, affiliates, successors, transferees,

6    assignees and the respective officers, directors, partners, agents, and employees

7    thereof and all other persons acting or claiming to act on their behalf from

8    repeating (or continuing and maintaining) the conspiracy or agreements alleged

9    herein;

10    F. Defendants are to be jointly and severally responsible financially for all costs,

11    including the expenses of a Court-approved notice program;

12    G. Plaintiffs and the Class recover their reasonable attorneys' fees as provided by

13    law; and

14    H. Plaintiffs and the Class receive such other or further relief as may be just and

15    proper.

16    **X.    JURY DEMAND**

17    Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiffs demand a trial by jury on

18    all matters so triable.

19

20    Dated: January 16, 2018                    Respectfully submitted,

21

22                                    By:    _____/s/ Christopher L. Lebsock_____
                                        Michael P. Lehmann (Cal. Bar No. 77152)
23                                      Bonny E. Sweeney (Cal. Bar No. 176174)
                                        Christopher L. Lebsock (Cal. Bar No. 184546)
24                                      Samantha Stein (Cal. Bar. No. 302034)
                                        HAUSFELD LLP
25                                      600 Montgomery Street, Suite 3200
                                        San Francisco, CA 94111
26                                      Tel: (415) 633-1908
                                        Fax: (415) 358-4980
27                                      E-mail:  mlehmann@hausfeld.com
                                        E-mail:  bsweeney@hausfeld.com
28                                      E-mail:  clebsock@hausfeld.com
                                        E-mail:  sstein@hausfeld.com

CLASS ACTION COMPLAINT                    30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Joshua H. Grabar (*Pro Hac Vice Forthcoming*)
Grabar Law Office
1735 Market Street, Suite 3750
Philadelphia, PA 19103
Tel: (267) 507-6085
E-mail: jgrabar@grabarlaw.com

Marc H. Edelson (*Pro Hac Vice Forthcoming*)
Edelson & Associates, LLC
3 Terry Drive
Suite 205
Newtown, PA 18940
Tel: (215) 867-2399
Email: Medelson@edelson-law.com

*Attorneys for Powerweb, Inc. and Powerweb Energy, Inc.*